Fuld, J. (dissenting).
My disagreement with the decision is basic, for, in my judgment, the majority has, under the guise of construction, rewritten the agreement which the parties made. Both the trial court and the Appellate Division found in favor of the plaintiffs on each of the issues presented and it seems to me that the facts in the record before us compel an affirmance.
The plaintiffs, owners of four motion picture theatres located in Nassau County, brought this action to collect rent claimed to be due under written leases. The defendant Metropolitan Playhouses is the tenant which signed the leases, the defendant Skouras Theatres Corporation is the subtenant operating the theatres and the defendant Circuit Vendors, a wholly owned subsidiary organized by Skouras to handle the selling of candy and refreshments in the theatres. Since Metropolitan and Skouras are equally liable, I refer to these defendants interchangeably as Skouras.
The leases in question call for a fixed minimum rent plus a graduated percentage rental based on “ gross receipts,” and the litigation revolves about the meaning to be ascribed to that term insofar as it relates to the sale of candy and refreshments in the *315 theatres. Plaintiffs claim that the percentage rent is to be figured on gross receipts, that is, on the basis of all proceeds from such sales, while the defendants urge, first, that the percentage is to be calculated only on the basis of an alleged concession fee (of $20,000) paid by Vendors to Skouras and, second, that, if such fee be disregarded and Skouras itself treated as the seller of such candy, then, the percentage should be figured on the basis of net income, not gross receipts.
The leases go back many years. Prior to 1935, they provided for the payment of a fixed rent only. In 1935, however, the arrangement was modified so as to provide for a fixed minimum rent plus a percentage rental based on gross receipts, to put it simply, emanating from the leased premises. Twelve years later, in 1947, a Consolidation Agreement was executed which extended the tenancies to 1971; it called for a reduction in the amount of the.fixed rental and an increase in the rental based on the percentages. The period here involved is covered by both the 1935 and 1947 agreements, though to a far greater extent by the latter.
It was in 1948 that Skouras initiated the sale of candy in the theatres. For about a year, Skouras granted a concession therefor to People’s Candy Company. In June of 1949, however, concluding that it was more profitable for a theatre operator to run its own refreshment stands and itself sell candy, Skouras eliminated People’s and undertook the operation through its 100%-owned subsidiary Vendors. As the trial court found, although Skouras acted through Vendors, the latter “ exists only in name * * * [and] has no independent corporate life ”. In short, as the trial court put it, “ there was no concession in fact from Skouras to Vendors ”, for it was Skouras which received for itself every penny realized from the sale of the candy and refreshments.
This is very different, it is to be noted, from the arrangement effected between Skouras and Apex Beverage Corporation when the former licensed Apex to sell beverages in the theatres; the fee there agreed upon was 50% of the gross receipts,11 of all moneys derived through the sale of such beverages ”, and Apex was required to bear every item of expense to permit the business to be carried on, including all costs, taxes and license fees.
*316 It is clear from what has already been said that the evidence supports the decision of the courts below that the claim of concession and license fee served to conceal the actual receipts realized by the defendants from the candy sales. And, since Skouras actually received the proceeds from the candy operation, it necessarily follows that it must pay its percentage rental on the basis of such proceeds and not on the basis of any pretended or unreal fee. Skouras was, of course, privileged to enter into a bona fide arrangement with a third party and, if it had done that, the percentage rental would be computable on the amount received from its concessionnaire, but, as already indicated, there was neither a concession nor a concessionnaire and the tenant could not avoid its lease obligation by creating a wholly owned subsidiary and interposing such subsidiary between itself and the landlord. (See, e.g., Higgins v. California Petroleum Asphalt Co., 122 Cal. 373.)
We need not become involved in any discussion of independent entities or of piercing the corporate veil. The simple fact is that Vendors was nothing more or less than the alter ego of Skouras or, in a term more earthy, its dummy. We are, therefore, all agreed that the receipts of Vendors are the receipts of Skouras, and its percentage rental must be figured on the basis of such an amount.
We come, therefore, to the question of whether the lease agreement provides that the stipulated percentage is to be computed on gross receipts, as both Special Term and the Appellate Division concluded, or on gross receipts less the cost of the candy and refreshments sold, as the court is now holding.
The contract, it is plain, provides that the base on which the percentage rental is to be computed is “ gross receipts,” as that term is ordinarily and reasonably understood. As here applicable, the lease agreement, after declaring that the tenant was to pay (in addition to the fixed rent) a sum of money equal to 20% “ of all * * * yearly gross receipts in excess of ” $1,000,000 for each year, goes on to define that term as follows:
“V. (A) ‘ G-boss Receipts’, as used in this agreement, shall be deemed to include all income and revenue arising from the operation of each of the demised prem *317 ises, less such gross receipts taxes as may be levied, imposed or assessed against such gross receipts, including all receipts of whatsoever kind derived from each of said demised premises, and without limiting the generality of the foregoing, shall include: (1) all box office receipts excluding taxes on admissions; (2) all rentals and/or income derived from apartments, stores, offices or rentable space contained in said theatres, and all income derived from concessions and advertising; (3) all net receipts derived from the sale of admission or coupons outside of the box office.” (Italics supplied.)
And, then, dealing expressly with the subject of “ deductions,” the agreement continues:
í ¡ iphe Tenant shall be allowed no deductions whatsoever from the gross receipts, as hereinabove defined, excepting, only, that the Tenant shall be allowed to deduct therefrom the amount of assessments paid by the Tenant * * * the additional rent arising from and payable * * * pursuant to * * * lease * * * relating to the Calderons Theatre * * * [and] the additional expense incurred for actual salaries paid to vaudeville performers or stage performers, stage hands and musicians # * * and any and all other expenses incidental thereto ”.
The agreement could hardly have been phrased more broadly. The yardstick is “ gross receipts ”, and this term, by the contract ’s own definition, includes ‘ ‘ all income and revenue ’ ’ arising from the operation of the premises, “ less such gross receipt taxes as may be levied * * * against such gross receipts, including all receipts of whatsoever kind” derived from the premises. Indeed, the clause goes on to recite that, “ without limiting the generality of the foregoing,” gross receipts “ shall include ” (1) all box office receipts excluding only taxes on admissions; (2) all rentals from apartments, stores or rentable space in the theatres and all income from concessions and advertising; and (3) all net receipts from the sale of tickets outside of the box office.
*318 In short, every bit of income — “ all income and revenue ” — is to be the base for the computation of the percentage rental excepting only the items specified, that is, excepting only gross receipts taxes, taxes on admissions, amount of assessments, adjustment for the building costs of the Calderone Theatre and expenses incurred for salaries paid to vaudeville performers, stage hands and musicians. In fact, the only reference in the agreement to a figure other than a “gross” amount is in clause (3)—that gross receipts include “all net receipts” derived from the sale of admissions or coupons outside of the box office — and its use therein unequivocally demonstrates that, if the parties had intended that the percentage rent should be computed on the basis of “ net ” income or of receipts “ less cost,” they would have so provided.
As is apparent, the provision defining gross receipts was designed to give it the broadest possible scope. This is plainly reflected by the phrasing; gross receipts, as used in this agreement, it is written, “ shall be deemed to include ” the items enumerated. And what are these items? The answer, supplied by the agreement, is clear: “ all income and revenue ” arising from the operation of the demised premises. And almost as significant as the language just remarked is the use of the word “ such ”. Gross receipts, we have seen, shall include “ all ” income and revenue, less “ such gross receipts taxes ” as may be levied or assessed against “ such gross receipts ”. The “ such” in the latter phrase is a reference back to the term “ all income and revenue ”, and the use of the phrase “ such gross receipts ” serves to accentuate the exceedingly broad reach of the term “ all income and revenue ”. In brief, as the writing makes plain, gross receipts were to include all revenue received by the tenant excepting only the several items listed and, as is equally patent, no provision was made for the deduction of the cost of candy or, for that matter, the cost of any other revenue-producing operation.
That this was the understanding of Skouras itself is, indeed, confirmed by its conduct before any controversy developed. The theatres had other operations, besides the sale of candy, from which the tenant realized revenue and, in connection with each of these operations, the tenant, in figuring and reporting the sum on which the percentage rental was to be calculated, fisted *319 the “ full ”, the “ whole ”, amount of income received without deducting a penny of cost or expense incurred in producing such gross income. Here we have practical construction, of the term gross receipts, of a most impressive and persuasive character.
How, then, does the court seek to avoid the compulsion of language, logic and practical construction and reach the conclusion that, insofar as the candy operation is concerned, the percentage rental is to be figured not on the entire gross receipts from the candy sales, but on such gross receipts less the cost of such merchandise? It argues that, “ if the concession had been leased to a third party the percentage rental payable to the landlords thereon would be computed only on the amount paid by the third party to Skouras for the privilege of the concession ” (opinion, p. 313). This, of course, is so, but I fail to perceive ■what it has to do with the case before us. There was here no grant of a privilege to sell candy, the prerequisite to the existence of a concession. The business of selling candy and refreshments was a self-operation, the very antithesis of a concession. Since, then, there vyas no concession, the agreement makes it unequivocally clear that the percentage rental is to be calculated on “ all income and revenue ” arising from the operation of the theatres — without deduction of any kind “from the gross receipts ” — and not, under clause (2), on the basis of “income derived from concessions. ’ ’
The argument that the parties could not have intended a rental based on gross receipts because such an arrangement would have been unprofitable for the tenant is beside the point. As the trial court most aptly observed, “Whether ‘ gross receipts ’ applied to sales of candy would make such an undertaking profitable is a matter for bargaining, and in any case there is nothing to show that it is unprofitable.”[1] As a matter of fact, the record before us demonstrates that considerable *320 thought had been given to the selection of “ gross receipts ” as the base for computation and to the fixation of the particular percentages specified. The formula ultimately decided upon, the fixed minimum rent plus a percentage of gross receipts on a graduated scale, had been designed, it was said, to assure that the deal would be “ on a partnership basis ” and that landlord and tenant would, as nearly as possible, be ‘ ‘ on a fifty-fifty basis in the final operation of these properties ”. Such an objective would, of course, be defeated if the percentage rental were to be calculated on the basis of net income rather than of gross receipts.
In point of fact, the argument that the parties could not have intended a rental based on gross receipts because of its unprofitability for the tenant, even if relevant, lacks weight, since under certain circumstances the tenant would make a greater profit from self-operation than from a concession, even though its obligation is to pay rental on the entire gross receipts in the case of self-operation. It is not necessary to demonstrate that self-operation would always be more profitable to the tenant than a concession arrangement; it is sufficient merely to show that, under some realistic circumstances, the tenant would derive greater profit from self-operation than from a concession, even though under the necessity of paying a percentage on all gross receipts. For example, if we assume that the gross receipts from the candy sales amount to $1,000 and the cost of operation to $400, then, in case of a concession under which the concessionnaire pays $400 (40% of gross receipts), the tenant would receive a net benefit of $320 after paying $80 to the landlord, whereas under self-operation, despite the fact that the tenant would pay $200 (20% of gross receipts), his net benefit would, nevertheless, amount to $400.
Since the tenant could thus be the recipient of a greater profit from self-operation than from a concession, it was perfectly reasonable for it to choose self-operation, despite the fact that this would require it to pay a greater rental to the landlord than it would pay in the case of a concession. This is clearly in accord with the percentage rental concept under which the parties share in the benefits. The tenant is not penalized, as suggested by the court (opinion, p. 314), when it pays a larger amount to the *321 landlord, because it is also receiving a larger net benefit. If there is more to share, it is not unreasonable that the landlord should also profit. If the circumstances are such that a tenant believes that it would receive a greater net benefit by a concession operation, it is free to choose that alternative. If it turns out that its calculation was erroneous, this is a risk which it has chosen to take. That does not, however, give the tenant the privilege of demanding the benefits under each of the two inconsistent alternatives, that is, retaining all of the profits realized from self-operation while at the same time insisting on paying the landlord a percentage on a portion only of the gross receipts, viz., the profits, instead of the entire gross receipts.
Finally — and this might well have been our point of beginning— if the base be not gross receipts, then, the agreement supplies no method or predicate for figuring the percentage rental on the sales from candy. If gross receipts from such sales are not to be accounted for, if the computation is not on the basis of gross receipts, there would be no measure for determining the amount to be paid on these sales and, as the trial court recognized, Skouras “ would have had a source of income ‘ from the operation of each of the demised premises ’ without paying anything for it.” The agreement carefully lists “gross receipts taxes,” “taxes on admissions” and “the amount of assessments ” as the items “ allowed ” to be deducted from gross receipts, but it makes no mention of any item of cost or expense incurred in the sale of candy or other merchandise. A court should not rewrite the agreement either to provide for their deduction or to specify the particular item of “ cost ” or “ expense ” to be deducted. The very impossibility of arriving at a figure representing net income from the candy operation further confirms the construction which has been accorded by the courts below to the term “ gross receipts ”.
In brief, then, the lease agreement requires Skouras to pay a percentage rental on the sales of candy and refreshments, not on the alleged license fee of $20,000 from its wholly owned subsidiary Vendors, and that percentage is to be computed on the basis of gross receipts, not gross receipts less the cost of the merchandise or any other base.
The judgment of the Appellate Division should be affirmed.
*322 Chief Judge Conway and Judges Dye and Van Voobhis concur with Judge Froessel; Judge Fuld dissents in an opinion in which Judges Desmond and Burke concur.
Judgment reversed and a new trial granted in accordance with the opinion herein, with costs to appellants in all courts.

. In this connection, it is interesting to note that the Apex Beverage Corporation, to whom Skouras had granted the beverage concession, agreed to, and did, pay Skouras 50% of its gross receipts, 50% of “all moneys derived through the sale of [its] beverages ”, without deductions of any kind whatsoever, it being expressly agreed that the concessionnaire Apex was to pay not only the entire “ cost of supplying and furnishing of cups, beverages, syrup”, etc., but every other conceivable expense incurred in connection with the sale of the beverages, and yet there is nothing to indicate that the deal proved unprofitable for Apex.